UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| STACY S.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:21-cv-00395-MJD-JMS |
| | ) |
| KILOLO KIJAKAZI, | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON JUDICIAL REVIEW**

Claimant Stacy S. requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. *See* 42 U.S.C. § 423(d); 42 U.S.C. § 1382. For the reasons set forth below, the Court **REVERSES** the decision of the Commissioner.

**I. Background**

Claimant applied for DIB and SSI in October 2019, alleging an onset of disability as of July 5, 2019. [Dkt. 7-7 at 13.] Claimant's applications were denied initially and again upon reconsideration, and a hearing was held before Administrative Law Judge Gladys Whitfield ("ALJ") on February 25, 2021. [Dkt. 7-2 at 26.] On April 22, 2021, ALJ Whitfield issued her

---

[1] In an attempt to protect the privacy interest of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

determination that Claimant was not disabled. *Id.* at 8. The Appeals Council then denied Claimant's request for review on August 16, 2021. *Id.* at 2. On October 19, 2021, Claimant timely filed her Complaint in this Court seeking judicial review of the ALJ's decision. [Dkt. 1.]

## II. Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423.[2] Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, she is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits her ability to perform basic work activities, she is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 CFR pt. 404, subpart P, App. 1, the claimant is disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform her past relevant work, she is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform her past relevant work, but can perform certain other available work, she is not disabled. 20 CFR § 404.1520. Before continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019)

---

[2] DIB and SSI claims are governed by separate statutes and regulations that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to those that apply to DIB.

(citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). If, at any step, the ALJ can make a conclusive finding that the claimant either is or is not disabled, then she need not progress to the next step of the analysis. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (citing 20 CFR § 404.1520(a)(4)).

In reviewing a claimant's appeal, the Court will reverse only "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). While an ALJ need not address every piece of evidence, she "must provide a 'logical bridge' between the evidence and [her] conclusions." *Varga*, 794 F.3d at 813 (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010)). Thus, an ALJ's decision "will be upheld if supported by substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). This Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether the claimant is disabled. *Id.*

### III. ALJ Decision

ALJ Whitfield first determined that Claimant had engaged in substantial gainful activity from December 2019 through December 2020.[3] [Dkt. 7-2 at 13.] At step two, the ALJ found that

---

[3] While not necessary to determine the issues presently before the Court, the Court wonders whether Claimant's work history truly constitutes substantial gainful activity since, as Claimant underscores, her hours were reduced to part-time, she was demoted from her managerial position, and her employer created a "light duty" position specifically to accommodate Claimant's limitations. [Dkt. 9 at 11.] On remand, the ALJ shall take care to provide a more thorough analysis to support their step one determination.

Claimant had the following severe impairments: "degenerative changes and fracture of the cervical spine; sacrococcygeal disorder; fractured right hip socket with chronic leg pain; and right knee bursitis with a tendon tear." *Id.* at 14. The ALJ determined that Claimant's obesity, otitis media, allergic rhinitis, hypertension, and insomnia were non-severe. *Id.* At step three, the ALJ found that Claimant's impairments did not meet or medically equal a listed impairment during the relevant time period. *Id.* at 14-15. ALJ Whitfield then found that, during the relevant time period, Claimant had the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. Frequent reaching forward and to the side. Occasional reaching overhead, pushing, pulling, handling, fingering, and feeling. No operation of foot controls. Avoid all use of hazardous moving machinery and exposure to unprotected heights.

*Id.* at 15.

At step four, ALJ Whitfield found that Claimant was unable to perform her past relevant work during the relevant time period. *Id.* at 18. At step five, relying on testimony from a vocational expert ("VE"), the ALJ determined that Claimant was able to perform jobs that exist in significant numbers in the national economy, such as general office worker (DOT 222.587-038), receptionist (DOT 237.367-018), and attendant (DOT 349.677-018). *Id* at 19. Accordingly, ALJ Whitfield concluded that Claimant was not disabled. *Id.* at 20.

## IV.  Discussion

On July 5, 2019, Claimant was involved in a rear-ended motor collision which resulted in multiple injuries, including a fractured neck, fractured right hip, and spinal cord injury. Claimant subsequently underwent a C6 corpectomy with C5-7 anterior cervical fusion and C5-T2 posterior spinal instrumented fusion, but residual nerve damage, pain, and physical limitations remained. She alleges disability due to the injuries sustained in the collision and various adverse residual

conditions, such as nerve damage, loss of use of her bilateral fingers, chronic leg weakness, limited mobility, chronic pain, and neuropathy.

Claimant now asks the Court to reverse the ALJ's decision on the grounds that ALJ Whitfield (1) erroneously evaluated the medical source opinions, and (2) failed to adequately address conflicts in the vocational expert's testimony. [Dkt. 9.] In response, the Commissioner contends that reversal is inappropriate because the ALJ's findings were supported by substantial evidence. [Dkt. 12.] As detailed below, the Court agrees with Claimant that the ALJ's decision must be reversed.

### A. The ALJ Erred by Mischaracterizing the Record and Inadequately Considering the Medical Opinions

Claimant first argues that ALJ Whitfield erred by relying on the opinion of a non-examining medical source over two treating medical sources without adequately articulating how she weighed each opinion. [Dkt. 9 at 8.] Specifically, Claimant asserts that the ALJ inappropriately rejected Claimant's treating sources "with an insufficient copy-and-paste recitation of the same cherry-picked findings." *Id.* The Commissioner responds that ALJ Whitfield "reasonably considered the medical opinions of record when evaluating [Claimant's] RFC." [Dkt. 12 at 10-11.]

For claims filed after March 27, 2017, as is the case here, treating source opinions are no longer entitled to controlling weight. Rather, an ALJ must evaluate the persuasiveness of all medical opinions contained in the record by articulating, at a minimum, whether the opinion is supported by and consistent with the evidence in the record. 20 CFR § 404.1520c. Other factors an ALJ may consider when weighing a medical opinion include the source's relationship with the claimant, the length of such relationship, the frequency of examinations, and the source's specialization. 20 CFR § 404.1520c(c). Here, the record contains medical opinions from a State

5

agency consultant, Claimant's primary care physician's assistant, and the surgeon who operated on Claimant after the car accident.

The State agency physician at the initial level determined that there was insufficient evidence to assess Claimant's disability application. [Dkt. 7-4 at 12.] On June 23, 2020, at the reconsideration level, non-examining State agency physician Shayne Small, MD, found that Claimant was severely impaired by her spine disorder and was able to perform a range of light work with various exertional, postural, and manipulative limitations. *Id.* at 21-24. Dr. Small also opined that Claimant's symptoms of pain and loss of sensation were "substantiated by the objective medical evidence alone." *Id.* at 21. In her decision denying Claimant benefits, ALJ Whitfield found Dr. Small's opinion "somewhat persuasive" on the grounds that "[i]t is generally consistent with, and supported by, the substantial evidence of record . . . and such evidence supports some additional limitations." [Dkt. 7-2 at 17.]

On August 5, 2020, Claimant saw David Stockwell, MD, for a post-surgery follow-up. [Dkt. 7-22 at 30.] Dr. Stockwell reported that Claimant

> underwent a C6 corpectomy with C5-7 anterior cervical fusion and C5-T2 posterior spinal instrumented fusion by myself on 7/8/2019. Unfortunately she sustained a[n] incomplete spinal cord injury. She has regained some function but still has limitations with her left greater than right arm. The left trapezius is weak and she has trouble with movement above her head. She also has trouble with intrinsics in her hands. She does work as a hairstylist and this is somewhat limiting. It tends if she has a special scissor which was made which allows her to be more functional but she cannot [do] aspects of her job that she used to. She is having episodes where her fingers will lock up which sound consistent with the trigger finger. She also reported that she has not yet seen a rehab doctor since her initial hospitalization. No recent episodes of physical therapy either.

*Id.* On exam, Claimant exhibited decreased strength in her bilateral intrinsic muscles and her left triceps. *Id.* Dr. Stockwell further opined that Claimant

> still has some residual deficits related to her injury. She has made a remarkable recovery and is doing very well overall. She notes that she is currently working 8-

6

> hour days but feels it is too much. I think 6-hour days are [a] reasonable goal for her.

*Id.* He provided new referrals to physical therapy and "to the orthopedic hand specialist to assess her for the trigger finger issues." *Id.* In her decision, ALJ Whitfield stated that, "[t]o the extent the foregoing is an opinion, it is unpersuasive" on the grounds that "[i]t is generally inconsistent with, and unsupported by, the substantial evidence of record . . . and such evidence does not generally support a 6-hour day limitation." [Dkt. 7-2 at 18.]

On January 28, 2021, Emily Adams, PA-C, completed a Physical RFC Questionnaire. [Dkt. 7-22 at 39.] PA-C Adams reported that she had treated Claimant every three months for 15 years and that Claimant's diagnoses included hypertension, insomnia, and a cervical spinal cord injury with myelopathy. *Id.* Claimant's symptoms included ongoing and constant pain in her neck, arms, and hip "due to severe trauma from [the motor vehicle accident]"; weakening in her arms, wrists, and hands; and an inability to use her hands properly. *Id.* PA-C Adams noted that, although Claimant "does do well to manage pain with tramadol, Norco, [and] gabapentin," "nerve damage is present from spinal cord injury" as well as "degenerative changes from hip [fracture]." *Id.* PA-C Adams stated that, while Claimant is capable of tolerating moderate work stress, her pain and symptoms would nonetheless interfere with the attention and concentration needed to perform even simple work tasks "constantly." *Id.* at 40. She noted that Claimant is able to walk one block without rest or severe pain; can sit for 30 minutes at a time before needing to change positions; can stand for one hour at a time before needing to change positions; can sit for about four hours total in an eight-hour workday; can stand/walk for about four hours total in an eight-hour workday; must walk every 30 minutes for five-to-ten minutes in an eight-hour workday; requires the ability to shift positions at will; and needs to take unscheduled breaks for 10-to-15 minutes at least once an hour. *Id.* at 40-41. PA-C Adams further stated that Claimant

7

can rarely lift/carry less than one pound; can never lift/carry 10 pounds or more;[4] can rarely look down; can rarely turn her head to the right or the left; can never look up; can frequently hold her head in a static position; can occasionally twist and climb stairs; can rarely stoop, crouch, squat, or climb ladders; and has significant limitations with reaching, handling, and fingering. *Id.* at 41-42. PA-C Adams opined that Claimant "has limited [range of motion] of neck and this does affect her FOV-peripheral vision," and that "nerve damage has severely impaired use of hands." *Id.* at 43. In her decision, ALJ Whitfield found PA-C Adams' opinion "somewhat persuasive" on the grounds that "[i]t is generally inconsistent with, and unsupported by, the substantial evidence of record . . . and such evidence does not generally support such severely restrictive limitations." [Dkt. 7-2 at 18.]

      The Commissioner contends that, "based upon her review of the record and her reliance on Dr. Small's reconsideration report, the ALJ supportably concluded that [Claimant] had the RFC to perform a reduced range of light work." [Dkt. 12 at 12-13.] However, this argument is unpersuasive because Dr. Small's reconsideration occurred in June 2020, meaning he did not have the benefit of reviewing Claimant's entire file which contained updated records, including a cervical spine x-ray, multiple reports of worsening pain and new muscle spasms, and the opinion of Dr. Stockwell. This is an important distinction to make because "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Goins*

---

[4] The Court notes that ALJ Whitfield did not include any lifting or carrying limitations in her RFC. Had PA-C Adams' opinion been credited over the non-examining opinion of Dr. Small, Claimant would be unable to perform the lifting/carrying requirements of light or sedentary work.

*v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)). Additionally, contrary to the Commissioner's assertion, ALJ Whitfield's review of the record is fundamentally flawed. In each aforementioned evaluation, the "substantial evidence of record" used by the ALJ to support Dr. Small's opinion and reject Dr. Stockwell's and PA-C Adams' opinions consisted of, verbatim,

> the generally largely negative findings from physical exams, the claimant's failure to follow through on rehabilitation, physical therapy, and orthopedic hand specialist referrals, and her activities of daily living (e.g., she has worked consistently, generally at substantial gainful activity levels since later November 2019; further, physical exam findings in March 2020 included full range of motion in all major joints, a normal gait, cervical spine tenderness to palpation, and a pain severity level of only 3/10).

*Id.* at 17-18. Critically, the ALJ's regurgitation of the exact same paragraph to support and reject the medical opinions does not convince this Court that meaningful review has taken place. The Court is also unable to trace the ALJ's reasoning, specifically with regard to which parts of the opinions she did find persuasive, because the ALJ did not state as much. Indeed, ALJ Whitfield's copied-and-pasted reasoning provides no meaningful analysis as to the supportability and consistency of the medical opinions. And although an ALJ is not required to consider all of the factors enumerated in 20 CFR § 404.1520c(c), surely PA-C Adams' 15-year examining relationship and Dr. Stockwell's specialization warranted consideration here. Simply put, the ALJ's skeletal articulation of the persuasiveness of the medical opinions is insufficient to withstand review.

Moreover, the "substantial evidence" used by ALJ Whitfield to reject Dr. Stockwell's and PA-C Adams' opinions constitutes an egregious misrepresentation of the record. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency . . . if . . . the reasons given . . . do not build an accurate and logical bridge between the evidence and the result."). For example, in characterizing Claimant's physical exams as

9

containing "generally largely negative findings," ALJ Whitfield engages in an inexcusable cherry-picking of the evidence. In fact, the Court struggles to find medical records that do not document abnormal findings. The record reveals that, in October 2019, PA-C Adams documented that Claimant "experiences a constant left arm pins and needles sensation"; only the first and second digit of Claimant's left hand works, with the third, fourth, and fifth digits "fall[ing] into a fist on [their] own"; Claimant's "[r]ight hand is in a brace"; and Claimant's pain is "3/10 without activity and a 6/10 with activity." [Dkt. 7-12 at 12.] On exam, Claimant exhibited "[l]imited range of motion of bilateral hands and of her neck." *Id.* In November 2019, Claimant's primary care physician, Thomas Black, MD, noted that Claimant was "trying to go back to work and is having horrible pain and feels like she can't make it through the day," and that "[s]he can't move her fingers well." *Id.* at 10. In December 2019, Dr. Black reported that Claimant "still has significant pain in her neck from the [fracture]." *Id.* at 8. In January 2020, Claimant was taking oxycodone four-to-five times a day but was "still hurting." *Id.* at 4. And in November 2020, PA-C Adams documented Claimant's exhibition of

> left posterior neck edema, bilateral weakness in her wrists and fingers. Unable to extend fingers on the left and right hand. Able to flex well. Right hand + thenar atrophy + left shoulder weakness. Limited range of motion in the C-spine in all directions. Unable to fully extend left shoulder above her head. . . . [W]eather changes are causing more pain. Still has a hard time getting up in the am and before bed. Pain spikes at those times.

[Dkt. 7-22 at 35-36.] ALJ Whitfield does not acknowledge the majority of these findings. In fact, from PA-C Adams' November 2020 report, ALJ Whitfield only mentions that Claimant "was unable to extend the fingers on her bilateral hands but was able to flex well." [Dkt. 7-2 at 16.] Clearly, this is not an accurate representation of the record.

The ALJ also uses Claimant's March 2020 pain rating of "only 3/10" to reject the opinions of Dr. Stockwell and PA-C Adams, while ignoring all other pain ratings in the record.

10

*See, e.g.*, [Dkt. 7-12 at 4] (January 2020: pain rated 6/10); [Dkt. 7-12 at 49] (February 2020: pain rated 6/10 "and is aggravated with physical activity. Pain is constant"); [Dkt. 7-14 at 2] (May 2020: "Patient has experienced aggravated pain the past 2 weeks . . . described as constant and dull"); [Dkt. 7-15 at 26] (June 2020: "Pain is rated moderate today"). It is true that "an ALJ need not mention every piece of evidence, so long [as] [s]he builds a logical bridge from the evidence to [her] conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)). However, equally as important, an ALJ also "has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Id.* (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)). As demonstrated, the ALJ did not fulfill that obligation here, and thus the Commissioner's argument that "the ALJ reasonably summarized the record in her opinion analyses," [Dkt. 12 at 13], fails outright.

      Additionally, the ALJ's statement that Claimant failed to follow through on rehabilitation and physical therapy is misleading at best. Not only did Claimant see pain management specialist Raheleh Rahimi Darabad, MD, from February 2020 to June 2020,[5] but he explicitly noted that Claimant "has completed physical therapy and occupational therapy and continues to have some flexion contracture in her hands." [Dkt. 7-12 at 49.] *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) ("[W]e cannot uphold an administrative decision that fails to mention highly pertinent evidence.") (citations omitted). And while Claimant was referred to a new round of rehabilitation and orthopedic consultations in August 2020, Claimant reasonably argues that, at the time of her hearing, "only a few months had elapsed since the referrals had even been made, hardly

---

[5] The ALJ only briefly acknowledged one of Claimant's six pain management appointments. *See* [Dkt. 7-2 at 16].

11

reflecting some refusal to participate in ongoing care." [Dkt. 9 at 11.] Nonetheless, the ALJ had the duty to develop the record; if there was any question regarding why Claimant did not immediately pursue these new referrals, ALJ Whitfield should have sought clarification. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).

Finally, despite the ALJ's contention otherwise, Claimant's activities of daily living have little bearing on whether the medical opinions are supported by and consistent with the evidence of record. The only daily activity the ALJ points to is that Claimant "has worked consistently, generally at substantial gainful activity levels since later November 2019." But as Claimant underscores, her employment history following the car accident likely does not reflect SGA since her hours were reduced to part-time, she was demoted from her managerial position, and her employer created a "light duty" position specifically to accommodate Claimant's limitations. [Dkt. 9 at 11.] In any case, the Seventh Circuit has made clear that "[t]he fact that [the claimant] pushed herself to work part-time and maintain some minimal level of financial stability, despite her pain, does not preclude her from establishing that she was disabled." *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (citing *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003)). Indeed, "'even persons who are disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits.'" *Goins*, 764 F.3d at 679 (quoting *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012)). That is especially true when a claimant works part-time, as Claimant did, because "[t]here is a significant difference between being able to work a few hours a week and having the capacity to work full time." *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010). Simply put, the fact that Claimant engaged in part-time work is not a sufficient basis to reject otherwise supported medical opinions.

Taking all of the above into consideration, ALJ Whitfield erred by mischaracterizing the record and inadequately considering the available medical opinions. Reversal is therefore necessary because the ALJ's decision is not supported by substantial evidence and the requisite logical bridge is missing. On remand, the ALJ shall take care to accurately represent the record and clearly articulate her evaluation of, at the very least, the supportability and consistency of the medical opinions.

### B. The ALJ Erred by Failing to Address Conflicts in the Vocational Expert's Testimony

Claimant additionally argues that ALJ Whitfield erred by failing to adequately address conflicts and logical errors in the VE's testimony. [Dkt. 9 at 15.] In response, the Commissioner maintains that the ALJ's reliance on the VE's testimony was reasonable. [Dkt. 12 at 19.]

"If the claimant makes it past step four, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of jobs that exist in the national economy." *Young*, 362 F.3d at 1000 (citing *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)). While VEs may consult various sources to provide tailored job number estimates, "substantial evidence requires the ALJ to ensure that the vocational expert's estimate is the product of reliable methodology." *Ruenger v. Kijakazi*, 23 F.4th 760, 763 (7th Cir. 2022) (citing *Brace v. Saul*, 970 F.3d 818, 821-22 (7th Cir. 2020)). "A methodology is reliable when it is based on 'well-accepted' sources and the vocational expert explains her methodology 'cogently and thoroughly.'" *Id.* (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1155 (2019)).

At Claimant's hearing, the ALJ first posed a hypothetical individual who can never climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs, balance, stop, kneel, crouch, and crawl; and can handle bilaterally no more than occasionally. [Dkt. 7-2 at 54.] In response, the VE testified that such an individual could work at the light level as a general office clerk

(DOT 222.587-038; at least 100,000 jobs nationally), a receptionist (DOT 237.367-018; at least 70,000 jobs nationally), or an attendant (DOT 349.677-018; 25,000 jobs nationally), and at the sedentary level as a general office clerk (DOT 249.587-018; at least 300,000 jobs nationally), a receptionist (DOT 237.367-046; at least 150,000 jobs nationally), or a lobby attendant (DOT 379.367-010; 25,000 jobs nationally). [Dkt. 7-2 at 55-57.] When presented with the additional limitation of occasional fingering or feeling, the VE stated, "that additional factor would reduce numbers of jobs by 10% in terms of the office clerk and receptionist jobs" at both the light and sedentary levels. *Id.* at 58-59. Presented with the further limitation of only being able to lift less than 10 pounds, the VE added that such a limitation "would reduce by 50% the number of light jobs." *Id.* at 66. The VE averred that his testimony regarding the ability to perform Claimant's past work was based on the Dictionary of Occupational Titles ("DOT"); testimony regarding occasional handling and fingering and overhead reaching was based on the Occupational Requirements Survey ("ORS"); testimony regarding "the attendant work" was based on the Selected Characteristics of Occupations ("SCO"); and testimony regarding pushing, pulling, reaching, foot controls, absenteeism, and time off-task was based on "42 plus years of vocational counseling practice and placement experience of hundreds of people with disabilities." *Id.* at 60-61.

  Riddled with transcription errors—some comprehensible, some not—repeated interjections and back-tracking from the ALJ, and winding explanations that never truly answer the questions presented, most of the VE's explanation of his methodology is borderline unintelligible. Indeed, when Claimant's attorney asked the VE, multiple times in multiple different ways, to explain his methodology, the VE was evasive and altogether confusing. This illuminates a critical overarching issue: the VE did not explain his methodology "cogently and

14

thoroughly." *Ruenger,* 23 F.4th at 763 (citing *Biestek,* 139 S. Ct. at 1155). For example, when Claimant's attorney asked the VE to clarify how he reached the job number estimates provided, the VE testified as follows:

> Well, I'm talking about—I think the ORS is based on SOC[6] categories, which are general classifications of jobs. And within the HFOC[7] category, they're characterizing the number of jobs that are unskilled, semi-skilled, and so forth, and also breaking them down according to how often they are sedentary, light, and other physical—other requirements. And with an HFOC code, all I'm doing is providing a representative DOT number of—a DOT number that falls within that SOC code.

*Id.* at 66-67 (footnotes added). This explanation does not illustrate how the VE reached the job estimates he provided, and thus the Court is unable to confirm that such methodology was reliable. *See Ruenger,* 23 F.4th at 765 ("Because the expert failed to set forth an understandable methodology, we cannot review her methodology, let alone confirm that it was reliable."). To the extent it appears the VE relied on the ORS for the estimated numbers, Claimant correctly argues that the ORS data shows "a percentage of total jobs within broad categories," but does not readily show how many jobs altogether are available within a given job category. [Dkt. 9 at 16.] Moreover, the currently available ORS data is only a preliminary estimate based on two years of a planned five-year sample period. As Claimant underscores, "any job numbers obtained from this source would necessarily be incomplete and unreliable." [Dkt. 9 at 17.]

Claimant's attorney challenged the VE's methodology and pointed out these issues in a post-hearing brief submitted to the ALJ. *See* [Dkt. 7-9 at 4]. In her decision, ALJ Whitfield acknowledge such and stated at follows:

> The claimant's representative objected to these job numbers on the ground that the vocational expert's methodology for determining numbers of jobs is not reliable. The undersigned overrules this objection. The vocational expert has extensive

---

[6] The Court is unsure whether the "SOC" and "SCO" acronyms are interchangeable or whether this a transcription error.

[7] There is no explanation of what "HFOC" stands for; perhaps this is a transcription error.

> professional knowledge and experience in job placement and testified that he has observed the jobs being performed. Accordingly, the vocational expert's job information is found to be reliable.

[Dkt. 7-2 at 19] (citation omitted). In so stating, the ALJ has failed to carry her burden. As the Seventh Circuit recently held,

> when, as here, the claimant challenges the job-number estimate, the ALJ must compel the vocational expert to offer a "reasoned and principled explanation" of the methodology she used to produce the estimate. *Chavez*, 895 F.3d at 970. The expert's explanation must be sufficient to instill some confidence that the estimate was not "conjured out of whole cloth." *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2022).

*Ruenger*, 23 F.4th at 763. ALJ Whitfield made no such attempt to elicit a reasoned explanation of the methodology used to produce the estimated job numbers. Instead, she blindly accepted the VE's convoluted testimony. The concerns detailed in Claimant's post-hearing brief could have been assuaged with further testimony from the VE at Claimant's hearing but, like in *Ruenger*, ALJ Whitfield "did not press [the VE] to elaborate upon [his] methodology." *Id.* at 764. In fact, when Claimant's attorney asked the VE to repeat and further clarify "how ORS data is used and how it's compared to the DOT," ALJ Whitfield interjected: "Well, Attorney, it's 9:45. He's answered that question, and you can listen to the recording." [Dkt. 7-2 at 64.] Although the ALJ thereafter allowed the VE to answer the question, her demeanor likely impacted the hearing[8] and, in any case, she made no effort to clarify the VE's confusing explanation. As the *Ruenger* court admonished,

> [w]e are mindful of the time constraints and heavy caseloads faced by ALJs. But when a claimant challenges a vocational expert's job-number estimates, the ALJ has a duty to spend time inquiring into the expert's methodology. *See Chavez*, 895 F.3d at 970. This may require that ALJs ask more questions of vocational experts or slow down proceedings to give claimants a greater opportunity to pose their own

---

[8] As Claimant describes it, "the ALJ was impatient and pushed [Claimant's] representative to wrap up because she was annoyed the hearing was taking too long." [Dkt. 13 at 12; *see* Dkt. 7-2 at 64.]

16

> questions. Otherwise, ALJs risk shifting the agency's evidentiary burden to the claimant. *Id.*

*Ruenger*, 23 F.4th at 764.

> At the very least, the record would benefit from everyone slowing down when VEs take the stand. A disability determination may well mark the difference between income and no income for the claimant. With so much at stake in these proceedings, it is essential that a reviewing court be able to decipher the evidentiary record. Tapping the brake pedal may go a long way toward making everything more transparent.

*Id.* at 765 (Scudder, J., concurring).

In sum, the Court is unable to discern how the VE reached the job numbers provided and ALJ Whitfield failed to elicit a sound explanation. Accordingly, the ALJ's conclusion that there are significant numbers of jobs in the national economy for Claimant to perform is not based on substantial evidence, and remand is therefore necessary.

### V.  Conclusion

For the reasons set forth above, the Commissioner's decision is **REVERSED** and **REMANDED for further proceedings consistent with this Order**.

SO ORDERED.

Dated:  8 JUN 2022

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the Court's ECF system.